IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STARLA KAY BRAWLEY,

      Plaintiff,

    v.                                                                                                     Civ. No. 16-1033 KK

NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 13-1)[2] filed February 1, 2017, in connection with the *Motion to Reverse and Remand for a Rehearing with Supporting Memorandum* filed May 15, 2017, by Plaintiff Starla Kay Brawley (Doc. 20.) In her *Motion*, Ms. Brawley seeks an order reversing the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration (the SSA), to deny Ms. Brawley's claim for Title II disability and disability insurance benefits and her Title XVI application for supplemental security income. (Tr. 1, 13; Doc. 20 at 3.) The Commissioner filed a Response in opposition on July 14, 2017. (Doc. 22.) Ms. Brawley filed a Reply on July 17, 2017. (Doc. 23.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the *Motion* is well taken and shall be **GRANTED**.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case. (Doc. 10.)

[2] Hereinafter, the Court's citations to Administrative Record (Doc. 13-1), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

I.      **Background and Procedural Record**

Ms. Brawley filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income in March of 2013. (Tr. 213.) In that application, Ms. Brawley claimed that she became disabled in October 2007, at age 49, due to post-traumatic stress disorder (PTSD), anxiety, high blood pressure, insomnia, and thyroid problems, which conditions limited her ability to work. (Tr. 25, 247, 251.) Ms. Brawley met the insured status requirements of the SSA through March 31, 2011, and she has not engaged in substantial gainful activity since October 1, 2007. (Tr. 15.) In May of 2013, the SSA denied Ms. Brawley's claim for benefits on the ground that she was not disabled. (Tr. 142.) Upon Ms. Brawley's request for a review, the May 2013 decision was upheld. (Tr. 151.) Disagreeing with SSA's determination, Ms. Brawley requested a hearing before an Administrative Law Judge (ALJ). (Tr. 158-59.) On December 19, 2014, ALJ Eric Weiss held a hearing at which Ms. Brawley was represented by her counsel, Michael Armstrong. (Tr. 34.) Ms. Brawley and Mary Diane Weber, an impartial vocational expert, testified at the hearing. (Doc. 20 at 3; Tr. 36, 64.)

In regard to her employment history, Ms. Brawley testified that in 2001 she was terminated from her job as a deli associate at Walmart. (Tr. 41-45.) Beginning in 2006 she worked for two companies—one as an electronic technician on an assembly line (a job that she quit upon losing her temper), and another at which she began as a solar technician before being promoted to quality control (a job from which she was fired after she "got into it" with her foreman). (Tr. 53-57.) Ms. Brawley testified, further, that in 2008 she worked, through a temp agency, as a housekeeper for approximately one week—a job for which she was not called back. (Tr. 41-42.)

As to each of the foregoing jobs, ALJ Weiss queried Ms. Weber whether they could be performed by a

> hypothetical individual who is able to perform the full range of exertional work as defined by the regulations, [but who] may never climb ropes or scaffolds, and . . . must avoid more than occasional exposure to workplace hazards, such as moving machinery and unprotected heights[;who] is limited to simple routine and repetitive tasks and to simple work-related decisions[; and who]. . . may have only occasional interaction with the public, coworkers and supervisors.

(Tr. 69.) Ms. Weber testified that they could not. (Id.) However, in response to ALJ Weiss's further query, Ms. Weber testified that the so-described "hypothetical individual" should be able to work as a hand packager inspector, as a housekeeper in a motel or hotel, or as a dishwasher/kitchen helper. (Tr. 70.) Were this hypothetical person to be further limited to no contact with the public, such person could, in Ms. Weber's estimation, work as a hand packager inspector or a dishwasher. (Tr. 71-72.)

Thereafter, ALJ Weiss issued a notice of decision that was "unfavorable" to Ms. Brawley's application for benefits. (Tr. 10, 15.) The Appeals Council denied Ms. Brawley's request for review of that decision. (Tr. 1.)

Ms. Brawley claims that ALJ Weiss committed reversible error by: (1) improperly rejecting the medical opinion of her treating psychiatrist; (2) improperly rejecting findings of two state agency psychiatric consultants; and (3) failing to include a function-by-function assessment of her work-related mental abilities in his analysis of her residual functional capacity. (Doc. 20 at 2.) With regard to Ms. Brawley's first argument, the Court concludes that the ALJ erred in his evaluation of the treating physician opinions and that this error was not harmless. Because remand is necessary, the Court will not issue a decision with respect to Ms. Brawley's remaining arguments.

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[3] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.
>
> (2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.
>
> (3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.
>
> (4) If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC").

---

[3] Substantial work activity involves significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if the claimant does less, is paid less or has less responsibility than before or if performed on a part-time basis. *Id.* Gainful work activity is work activity that one does for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

*Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)   If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

### B. Standard of Review

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or

if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency. *Langley*, 373 F.3d at 1118.

### III. <u>Analysis</u>

ALJ Weiss made his decision that Ms. Brawley was not disabled at step five of the sequential evaluation. (Tr. 25-26.) At step 1, ALJ Weiss concluded that Ms. Brawley had not engaged in substantial gainful activity since October 1, 2007. (Tr. 15.) ALJ Weiss found at step 2 that Ms. Brawley had severe impairments of major depressive disorder, PTSD, and anxiety disorder, and non-severe impairments of high blood pressure, hypothyroidism, mild degenerative disc disease of the lumbar spine, and alcohol dependence (in remission). (Tr. 16.) At step 3, ALJ Weiss concluded that Ms. Brawley did not have an impairment or a combination of impairments that meets or medically equals the severity of an impairment listed in 20 C.F.R., part 404, subpart P. appendix 1. (Tr. 16-17.) *See* 20 C.F.R. § 404.1525(a) (stating that appendix 1 "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience"). More specifically, ALJ Weiss concluded that Ms. Brawley's mental impairments considered singly and in combination, did not meet or medically

6

equal the criteria of listings for "affective disorders" set forth in 20 C.F.R. pt. 404, subpt. P. app. 12.04, or the criteria for "anxiety-related disorders" set forth in 20 C.F.R. pt. 404, subpt. P. 12.06. (Tr. 16.) In reaching this conclusion, ALJ Weiss relied on a function report completed by Ms. Brawley, treatment records, a disability report, and the findings of state agency psychological consultants. (Tr. 16-17.)

At step 4, ALJ Weiss found that Ms. Brawley's RFC permitted her to "perform a full range of work at all exertional levels[.]" (Tr. 17.) He found, further, that Ms. Brawley had a series of "non-exertional limitations," namely—she could do work that "involves no climbing of ropes or scaffolds"; involves "no more than occasional exposure to workplace hazards such as moving machinery and unprotected heights." (Id.) Additionally, ALJ Weiss found that Ms. Brawley was "limited to simple, routine, and repetitive tasks, and to simple work-related decisions"; and that "[s]he may never have contact with the public and [may have] no more than occasional interaction with co-workers and supervisors." (Id.) Finally, ALJ Weiss concluded, as to step 5, that Ms. Brawley is unable to perform any past relevant work. (Tr. 25.) However, considering her age, education, work experience, and RFC, that Ms. Brawley can perform jobs that exist in significant numbers in the national economy such as the "representative occupations" of hand packager inspector, housekeeper, and dishwasher/kitchen helper, identified by Ms. Weber at the December 19, 2014 hearing. (Tr. 25-26.)

### A. Ms. Brawley's Relevant Medical History

Ms. Brawely has a long history of care and treatment for depression, anxiety, and PTSD. She also has a long and documented history of alcohol abuse, which issue appears from the record to be closely related to her psychiatric disorders.[4] The record contains medical evidence related to

---

[4] *See e.g.* Tr. 415 (reflecting a treating physician's assessment that "[Ms. Brawley] uses alcohol to cope with her intense feelings of anxiety and depression.");

7

these issues dating back to 2007. On May 30, 2007, Ms. Brawley began receiving treatment, including prescriptions for medication, at the Albuquerque Indian Health Center (AIHC). (Tr. 381.) Treatment notes from this visit indicate that Ms. Brawley's "active problems" included dysthymia, alcohol abuse disorder, depression, and depression with insomnia. (Id.) She was treated at AIHC again on December 12, 2007, at which time it was noted that she was homeless, had been incarcerated for 3 ½ months, was going to counseling, and that anxiety was among the enumerated purposes for her visit. (Tr. 383-84.) On January 16, 2008, Ms. Brawley was treated at AIHC for "fatigue" and other issues; whereupon it was noted that Ms. Brawley felt "tired" and was going to counseling but was "likely depressed." (Tr. 386.) On March 12, 2008, treatment notes from AIHC indicate that Ms. Brawley had an "okay mood," but her affect was flat, and that she was anxious. (Tr. 388-89.)

In June 2008 Ms. Brawley began receiving treatment at Albuquerque Health Care for the Homeless (AHCH). (Tr. 369.) In notes taken during a "New Clinical Assessment," Ms. Brawley was diagnosed with anxiety disorder; major, recurrent, severe depression; chronic PTSD; and alcohol abuse. (Tr. 369, 373.) During the course of her initial interview, Ms. Brawley was noted to have become "overwhelmed with painful feelings and tearful to the extent that she was unable to speak"; and in regard to her symptoms of depression, it was noted that Ms. Brawley explained that "some days are worse than others[.]" (Tr. 372.) Her mental status screening at this initial assessment reflected that her "appearance, attitude, & behavior" were appropriate; but her "mood & affect" were inappropriate; she was depressed and tearful; and she had "inappropriate" speech. (Tr. 369.) Treatment notes from a July 2008 visit to AHIC reflect that that Ms. Brawley had a history of depression, and had attempted suicide as a teenager. (Tr. 364.)

8

Ms. Brawley received psychiatric treatment (including prescriptions for medication) from AHCH related to her psychiatric diagnoses on June 13, 2008, July 29, 2008, September 17, 2008, November 11, 2008, February 11, 2009, June 19, 2009, July 6, 2009, August 26, 2009, February 22, 2010, March 20, 2010, April 12, 2010, May 18, 2010, and July 26, 2010. (Tr. 326-74.) Her mental status examinations from these visits reflect that Ms. Brawley consistently had a depressed mood and slow speech, but an "appropriate appearance"; and they often reflected that she had a blunt, tearful, or flat affect. (Tr. 326, 329, 332, 336, 341, 344, 351, 353, 358-59, 362, 365.) Treatment notes from these visits also reflected that despite her use of prescribed medications, she was consistently observed to be depressed and/or anxious. (See eg. Tr. 327, 330, 342, 351, 359.) Noted consequences of her mental disorder included: a suicide attempt, incarceration, DUI arrest, family disruption, homelessness, financial hardships, and emotional distress. (Tr. 366.)

From March 2009 through July 2014, Ms. Brawley received continuous treatment (thirty four treatment visits) at AIHC. (Tr. 392-492.) During that time she was seen by numerous providers, but she eventually transitioned to primary psychiatric treatment with Dr. Joseph Luzius. (Tr. 434.) Although Ms. Brawley did not begin individual treatment sessions with Dr. Luzius until February 2013, Dr. Luzius was among the providers in attendance at a behavioral health assessment at AHIC that was conducted on March 15, 2011, at which Ms. Brawley was given the Primary Care Evaluation of Mental Disorders and "scored high on the module for dysthymia." (Tr. 412, 413 ("Prime MD shows high on depression and anxiety."))

The following is a non-exhaustive summation of Dr. Luzius' treatment notes. In February 2013, Dr. Luzius noted that Ms. Brawley "has a long history of depression, anxiety and personality issues." (Tr. 434.) He noted that she was sleeping in excess, she felt very detached

9

from her life, she was depressed, she had increased anxiety, she felt hopeless and unmotivated, and her affect was depressed, anxious, and dysphoric. (Tr. 434-35.) Dr. Luzius diagnosed Ms. Brawley with major depressive disorder, PTSD, and alcohol dependence, with a GAF score of 55.[5] (Doc. 20 at 6; Tr. 435.)

Dr. Luzius saw Ms. Brawley twice in the two months that followed during which visits he performed a mental status examination and evaluated her medication. (Tr. 436-39.) In March 2013, Dr. Luzius noted that Ms. Brawley had a "more stable mood" but he also noted that she continued to have poor sleep and anxiety, and her affect was mildly anxious. (Tr. 436.) In April 2013, Dr. Luzius noted the Ms. Brawley "has had more depression but is coping," and that she had anxiety, poor sleep, low motivation, and "feels hopeless many days." (Tr. 438.) He also noted that Ms. Brawley was "stoic but has underlying dysphoria, is distressed, and suffers from despair"; and, he noted further, that her affect was idysphoric and tearful and that she had anxiety and more depression. (Id.)

In May 2013, Dr. Luzius noted that Ms. Brawley's Major Depressive Disorder had stabilized on her current medication, she had less anxiety since her last appointment and was no longer homeless, her mood was "ok," and her affect was euthymic. (Tr. 461.) During this visit, Dr. Luzius performed a "medical assessment of ability to do work-related activities" in which he assessed how Ms. Brawley's mental and emotional capabilities were affected by her impairments. (Tr. 469.) In conducting this assessment, Dr. Luzius considered Ms. Brawley's medical history from a year prior to her initial visit. (Tr. 469.) Dr. Luzius determined that

---

[5] A GAF score is a subjective rating on a one hundred point scale, divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders,* 32, 34 (4th ed. 2000). A GAF score of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *Id.* at 34.

Ms. Brawley had both moderate and marked limitations in four areas of functioning: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. (Tr. 469-70.)

In June 2013, as to her Major Depressive Disorder, Dr. Luzius noted that Ms. Brawley's social stressors were the largest contributor to her depression, that her medication was helping, and that while her mood was "ok," she had a dysphoric affect. (Tr. 457.) He assessed that her alcohol dependence was in remission. In July 2013, Dr. Luzius noted that Ms. Brawley had an alcohol-related relapse because she felt overwhelmed, angry, and frustrated; however, he noted that her then-present mood was "ok." (Tr. 455.) In mid-August 2013, Ms. Brawley was consuming 3 beers per day (Tr. 491), and at her August 21, 2013 psychiatric visit, Dr. Luzius noted that Ms. Brawley had partial remission of the majority of her symptoms of Major Depressive Disorder but that she had difficulty sleeping, rumination and anxiety, and a dysphoric and anxious affect. (Tr. 489.) Dr. Luzius made modifications to her medications to target sleep and mood issues. (*Id.*) In October 2013, Dr. Luzius noted that Ms. Brawley had an "ok" mood, and she was "stable" except that she had "more sleep problems" which required a medication adjustment. (Tr. 487.) In January 2014, Dr. Luzius noted that Ms. Brawley, who was then grieving the death of her father, had a "really sad" mood and a dysphoric affect, and she was depressed. (Tr. 485.) In May 2014, Dr. Luzius noted that Ms. Brawley had a stable mood, minimal anxiety, and was "socially stable." (Tr. 479.) In July 2014, Dr. Luzius noted that Ms. Brawley's response to her current medication was fair"; but her mood was "about the same" and she had a dysphoric affect and intermittent anxiety with irritable moods. (Tr. 477.) He noted, further, that her response to medication was "fair." (Id.)

In December 2014, Dr. Luzius completed a second "medical assessment of [Ms. Brawley's] ability to do work-related activities." (Tr. 495.) In conducting this second assessment, Dr. Luzius considered Ms. Brawley's medical history from "prior to 2011" and continuing through December 2014. (Tr. 496.) Dr. Luzius's second assessment was largely identical to his first, with few exceptions. (Compare Tr. 469-70 with 496-97.)

As part of the May 2013 and December 2014 assessments, Dr. Luzius completed forms pertaining to the criteria for "affective disorders" set forth in 20 C.F.R. pt. 404, subpt. P. app. 12.04, and the criteria for "anxiety-related disorders" set forth in 20 C.F.R. pt. 404, subpt. P. 12.06. In each evaluation, Dr. Luzius concluded that Ms. Brawley's symptoms satisfied the criteria for these disorders. (Tr. 472-73, 498-99.) Thus, Dr. Luzius' opinions are relevant to both steps three and four of the analysis.

### B. ALJ Weiss's Analysis Regarding Dr. Luzius' Opinions was Deficient

ALJ Weiss gave "partial weight" to Dr. Luzius's May 2013 and December 2014 medical assessment of Ms. Brawley's ability to do work-related activities, and rejected Dr. Luzius' medical opinions that Ms. Brawley's limitations met the Listing of Impairment for Affective Disorders, found at 20 C.F.R., Pt. 404, Subpart P, Appendix 1, ¶ 12.04, and the Listing of Impairment for Anxiety-Related Disorders, found at 20 C.F.R., Pt. 404, Subpart P, Appendix 1, ¶ 12.06. (Tr. 23, 472-473, 498-99.) In his opinion, ALJ Weiss noted the areas in which Dr. Luzius found Ms. Brawley to have marked and moderate limitations, and noted, further, that Dr. Luzius "said that the claimant would decompensate with even a minimal increase in mental demands or change in environment, and that she cannot function outside a highly supportive environment." (Tr. 23) ALJ Weiss reasoned that:

> [i]f accepted [Dr. Luzius's] assessments would necessitate a finding of 'disabled'. However, they do not find much persuasive support in the record, including from

> the treatment notes of Dr. Luzius, which repeatedly document mostly normal mental status findings, and which do not begin until December 2012. His findings that the claimant cannot function outside a highly supportive environment is seriously undermined by the fact that the claimant lives alone and takes care of herself . . . . Although he is an acceptable treating source, the assessments from Dr. Luzius are disproportionate with the medical evidence of record as a whole, including his own treatment records. Moreover he does not explain his responses. Therefore, these assessments are given partial weight.

(Tr. 23.) As discussed below, the Court is not persuaded that ALJ Weiss' stated reasons are legitimate or supported by substantial evidence.

### 1. **The Treating Physician Rule**

"According to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources." *Langley*, 373 F.3d at 1119; *see* 20 C.F.R. § 404.1527(c)(2)[6] ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."); 20 C.F.R. § 416.927(c)(2) (same). Indeed, where the opinions of treating physicians are medically well-supported and not inconsistent with substantial evidence in the record, they must be accorded "controlling weight." 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).

If, on the other hand, the treating physician's opinion is *inconsistent* with the record or is not supported by medical evidence, it is not given controlling weight. *See Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) ("[I]t is . . . error to give an opinion controlling weight simply

---

[6] For all claims filed on or *after* March 27, 2017, 20 C.F.R. § 404.1527 was rescinded and replaced with 20 C.F.R. § 404.1520c. 82 Fed. Reg. 5844, 5869. Further, the Social Security Administration rescinded SSR 96-2p effective March 27, 2017, to the extent it is inconsistent with or duplicative of final rules promulgated related to Giving Controlling Weight to Treating Source Medical Opinions found in 20 C.F.R. § 404.1527. 82 Fed. Reg. 5844, 5845.

because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." (alteration omitted)). Instead, the opinion, which is "still entitled to deference[,]" *Langley*, 373 F.3d at 1119, is weighed by means of the following six factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

20 C.F.R. §§ 404.1527(c), 416.927(c). In evaluating these six factors, the ALJ must be "sufficiently specific to make clear to any subsequent reviewers the weight [given] to the treating source's medical opinion and the reason for that weight." *Langley*, 373 F.3d at 1119. Not every factor listed above will apply in every case, and an ALJ is not required to mechanically apply, or expressly discuss, each factor in his written decision. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, "the record must reflect that the ALJ *considered* every factor in the weight calculation." *Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (citation omitted)).

In sum, in evaluating a treating physician's opinion, an ALJ must determine whether the opinion "is to be accorded controlling weight[] on the matter to which it relates." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). If such opinion is not controlling, the ALJ must determine the weight to give the opinion by evaluating and providing a reasoned analysis, guided by the factors enumerated in 20 C.F.R. Sections 404.1527(c) and 416.927(c). *Krauser*, 638 F.3d at 1330. Finally, "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence

and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000).

   2. **ALJ Weiss's Reasons for Rejecting Dr. Luzius' Opinions Do Not Accord with the Treating Physician Rule**

Apart from being incorrect in highlighting that Dr. Luzius' treatment notes do not begin until December 2012, by emphasizing this date, it appears the ALJ was attempting to justify his rejection of these opinions on his mistaken belief that they do not relate to the relevant time periods. Specifically, in pointing out that Dr. Luzius' treatment notes do not begin until December 2012, it appears that the ALJ was attempting to highlight the fact that Dr. Luzius' treatment relationship began more than four years after Ms. Brawley's alleged onset date of October 1, 2007 (Tr. 15), and 21 months after her date last insured, of March 31, 2011 (Tr. 15). However, as noted earlier, both of Dr. Luzius' assessments related back to 2010.[7] Furthermore, the Court observes that Ms. Brawley received regular psychiatric treatment from Dr. Luzius, who saw her at least twelve times between February 2013 and July 2014. (Tr. 434-64, 477-80, 485-90.) However, there is no indication that, in declining to give controlling weight to Dr. Luzius' opinions, ALJ Weiss considered the length of the treatment relationship, the frequency of the treatments, or the fact that Dr. Luzius was a specialist in the field of psychiatry. *See* 20 C.F.R. §§ 404.1527(c)(1), (2), (5) & 416.927(c)(1), (2), (5) (stating that the physicians' specialty in the area upon which an opinion is rendered and the length of the treatment relationship are relevant to the weight accorded to a physician's opinion).

---

[7] The Medical Assessment of Ability to Do Work Related Activities (Mental) form on May 8, 2013 specifically required Dr. Luzius to consider Ms. Brawley's "medical history and the chronicity of findings as from a year prior to her initial visit [on March 15, 2011] to current examination." (Tr. 469, 412-413.) The second Medical Assessment of Ability to do Work-Related Activities (Mental) form, completed by Dr. Luzius on December 3, 2014, specifically required him to consider Ms. Brawley's "medical history and the chronicity of findings as from prior to 2011 to current examination." (Tr. 497.)

15

Nor is the Court persuaded that the ALJ adequately considered the degree to which Dr. Luzius' opinions are supported by relevant evidence or the consistency between his opinions and the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(3)(4); 416.927(c)(3),(4). Failing to cite to any specific inconsistencies in the record, the ALJ emphasized that Dr. Luzius' assessments "are disproportionate with the medical evidence of record as a whole, including his own treatment records," which the ALJ characterized as documenting "mostly normal mental status findings." It is not clear to the Court whether the ALJ meant to characterize only Dr. Luzius' treatment notes, or those of all the treatment providers as documenting "mostly normal mental status findings," but whatever the intent, this reasoning is not supported by substantial evidence, and the Court agrees with Ms. Brawley, that it appears the ALJ is improperly inserting his lay opinion as a basis for rejecting a long-term treating physician's opinion.

The ALJ's discussion and the reasons for his conclusions in rejecting Dr. Luzius' assessments demonstrate a pattern of impermissible picking and choosing and mischaracterization of medical findings. *See Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to finding of nondisability."); *Morales*, 225 F.3d at 317 ("[A]n ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion."). For example, in his broad RFC analysis, the ALJ reasoned that in March 2013, Dr. Luzius noted that Ms. Brawley was "socially stable" and that her GAF score increased to 55. (Tr. 22.) However, Dr. Luzius's treatment notes from that visit also reflect that Ms. Brawley, despite reporting less stress, continued to have poor sleep and anxiety and a mildly anxious affect. (Tr. 436.) That the ALJ ignored these notes, while relying

16

on other notes from the same visit demonstrates that he selectively relied on those portions that were favorable, while ignoring those that were unfavorable, to his determination.

The ALJ reasoned further that Ms. Brawley "reported increased depression [in April] 2013, but said she was coping. As usual, mental status examination was negative apart from some mild abnormalities concerning [Ms. Brawley's] mood/affect." (Tr. 22.) It is unclear what the ALJ intended to convey in characterizing Dr. Luzius' treatment notes as indicating that "the mental status examination was negative apart from some mild abnormalities," and this language does not appear in Dr. Luzius' notes. Instead, Dr. Luzius' treatment notes pertaining to Ms. Brawley's mental status include, among other things, that she had an "idysphoric, tearful" affect, and a "not so good" mood. (Tr. 438.) Dr. Luzius's treatment notes also reflect that Ms. Brawley was anxious and depressed, and although "stoic" she had "underlying dysphoria, [she was] distressed and [she was] suffer[ing] from despair[.]" (Id.) Thus, not only does the ALJ's finding in regard to the April 2013 treatment notes illustrate that the ALJ substituted his lay opinion for that of Dr. Luzius by mischaracterizing the notes from her mental status exam, but it also demonstrates, again, that the ALJ selectively relied upon portions of the treatment notes that were favorable to his conclusion while ignoring those that supported Dr. Luzius' opinions.

The ALJ also noted that in June 2013, Ms. Brawley reported to Dr. Luzius that she "was doing well" but ignored Dr. Luzius' objective observation regarding her mental status including that she had a dysphoric affect. (Tr. 23, 457.) Further, the ALJ noted that in August 2013, Dr. Luzius "documented mostly normal mental status findings." (Tr. 23.) Again, however, Dr. Luzius' mental status findings do not include the phrase "mostly normal" (which phrase is repeatedly used by the ALJ, yet never used by Dr. Luzius). Instead, the mental status findings

17

noted by Dr. Luzius reflect his opinion that Ms. Brawley's affect was dysphoric and anxious. (Tr. 489.)

Finally, while the ALJ concluded that Dr. Luzius' opinions were "disproportionate with the medical evidence of record as a whole" this conclusory finding does not facilitate the Court's review, nor does it permit the Court to conclude that the ALJ applied the appropriate legal standards in reaching his decision. (Tr. 24.) *See Langley*, 373 F.3d at 1119 (requiring the ALJ's decision to be "sufficiently specific to make clear to any subsequent reviewers the weight [given] to the treating source's medical opinion and the reason for that weight"). As discussed earlier in this opinion, the record reflects that Ms. Brawley's long-standing psychiatric issues led her to seek treatment as early as May 2007. (Tr. 381.) In July 2008, psychiatric treatment notes reflect that the consequences of her mental disorder included: a suicide attempt, incarceration, DUI arrest, family disruption, homelessness, financial hardships, and emotional distress. (Tr. 365-66.)

The record also reflects that Ms. Brawley's symptoms persisted despite regular psychiatric care and medication. (*See e.g.,* Tr. 326-75, 381-439.) For example, despite having received consistent treatment from AIHC beginning in March 2009, when she was given a behavioral health assessment on March 15, 2011, the results of an evaluation of mental disorders revealed that she had high levels of depression and anxiety. (Tr. 412-13.) Treatment notes made approximately two months later by Dr. John Russo, M.D., who treated Ms. Brawley before her care was transferred to Dr. Luzius, show that Ms. Brawley "continue[d] to have significant symptoms of depression despite" her use of antidepressant medication, and that she had a hopeless mood and a depressed affect. (Tr. 418.) By May of 2012, Dr. Russo noted that there had been only "minimal progress in the treatment of [Ms. Brawley's] anxiety and depression[.]"

18

(Tr. 428.) The ALJ's decision does not provide insight into his reasons for concluding that these, among other relevant treatment records, are inconsistent with Dr. Luzius's opinions. *See Clifton*, 79 F.3d at 1010 (requiring the ALJ to discuss both the evidence supporting his decision *and* the probative evidence that he rejects); 20 C.F.R. § 416.1527(c)(2) (stating that in circumstances where the opinions of treating physicians are medically well-supported and not inconsistent with substantial evidence in the record, they must be accorded "controlling weight"); 416.927(c)(2) (same).

In summary, while the ALJ was not required to give controlling weight to Dr. Luzius' opinions, as her long term treating psychiatrist, Dr. Luzius' opinions were entitled to deference. Moreover, the ALJ must demonstrate, pursuant to the factors listed above, the reasons for the weight accorded. *See* 20 C.F.R. §§ 404.1527(c)(2), (3), (4) and (5) and 416.927(c)(2), (3), (4) and (5) (generally more weight will be given to medical source opinions based on how long treating sources have treated you, how frequently they have examined you, the nature and extent of the treatment relationship, whether their opinions are supported by relevant evidence, particularly medical signs and laboratory findings, whether their opinions are consistent with the record as a whole, and if they are specialists providing medical opinions about medical issues related to their area of specialty); *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (indicating that to accord "little weight to" a physician's opinion is tantamount to "effectively rejecting" it). The ALJ's conclusion that Dr. Luzius' treatment notes "document mostly normal mental status findings" (a phrase that appears in various iterations throughout the ALJ's opinion, yet never appears in Dr. Luzius' treatment notes and the meaning of which is unclear in the context of Ms. Brawley's long-standing psychiatric disorders), and his conclusion that Dr. Luzius's opinions were "disproportionate" with his own treatment records and with the

19

medical evidence of record as a whole is neither supported by substantial evidence nor does it reflect the ALJ's application of the appropriate legal standards.

Because the Court cannot "confidently say that no reasonable administrative factfinder, following the correct legal analysis, could have resolved the factual matter in any other way," the ALJ's erroneous analysis of Dr. Luzius' opinions was not harmless. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (stating the harmless error standard applicable to Social Security decisions). Accordingly, this matter shall be remanded for rehearing and a decision that provides the Court "with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen*, 436 F.3d at 1165.

## **CONCLUSION**

The Court concludes that ALJ Weiss's decision, insofar as it pertains to Ms. Brawley's treating physician, does not reflect his application of the appropriate legal principles, nor is it supported by substantial evidence. Accordingly, Plaintiff's *Motion to Reverse and Remand for a Rehearing with Supporting Memorandum* filed May 15, 2017 (Doc. 20.) is **GRANTED**.

_____
**KIRTAN KHALSA**
**United States Magistrate Judge**
**Presiding by consent**